UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAITLYN CUMBIE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MARK TIBBLES, an individual; MARK TIBBLES ENTERPRISES, LLC, a California limited liability company; TIBBLES PROPERTY SOLUTIONS, LLC, a California limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | No. 2:21-cv-01090 JAM AC<br><br>FINDINGS AND RECOMMENDATIONS |

This matter is before the court on plaintiff's motions for default judgment against all defendants. ECF Nos. 11 and 21. The motions are referred to the undersigned pursuant to E.D. Cal. R. 302(c)(19). For the reasons set forth below, the recommends plaintiff's motions be GRANTED and that judgment be entered in favor of plaintiff.

**I.     Background and Procedural History**

A. <u>The Complaint</u>

Kaitlyn Cumbie filed her complaint on June 18, 2021, invoking the court's diversity jurisdiction and presenting claims for promissory fraud, accounting, conversion, breach of contract, breach of fiduciary duties, and unfair business practices against Mark Tibbles, Tibbles

1

Enterprises, and Tibbles Property Solutions. ECF No. 1 at 2. The Complaint alleges as follows.

Plaintiff and her younger sister inherited a piece of real property (the "Miguel Way" property) in 2012. Id. In 2016, plaintiff's sister was experiencing personal problems that made it necessary for plaintiff to arrange for the sale of the Miguel Way property. Id. at 3. Plaintiff met defendant Tibbles on or around February 2017 when he came to plaintiff's residence and introduced himself as a licensed building contractor who was working with two local real estate agents. Id. Tibbles offered to assist plaintiff in rehabilitating and selling the Miguel Way property. Id. Plaintiff, lacking experience in real estate, gratefully accepted Tibbles' offer and sold the Miguel Way property to Tibbles in or around May 2017. Tibbles then renovated the Miguel Way Property and resold such real property in or around August 2017. Id.

Tibbles suggested to plaintiff that she invest some of the cash proceeds of the sale in his company, Tibbles Enterprises, to facilitate the rehabilitation and sale of another residential property. Id. Tibbles indicated that plaintiff would be a "silent partner" who provides the money to finance the acquisition of the property. Tibbles promised her $2,000 per month in profit, over a three-month time span, if plaintiff invested $30,000 with him with the option to "rollover" the money into a new property or cash out at close of escrow. Id. In reliance on Tibbles' promises, plaintiff provided $30,000 to Tibbles and Tibbles Enterprises on or around July 31, 2017. Id. In connection with such investment, plaintiff and Tibbles signed the two-page investment contract attached to the complaint as Exhibit "A" (the "Investment Contract"). Id. Plaintiff is informed and believes that Tibbles signed the Investment Contract both individually and in his capacity as the managing member of Tibbles Enterprises. Id.

The Investment Contract specifically related to the rehabilitation and sale of the real property commonly known as 7226 Elder Street, Rio Linda, California (the "Elder Street" property) and contemplated payment of a total of $6,000 in profits to plaintiff along with a return of her $30,000 investment upon the sale of the Elder Street property. Id. Plaintiff is informed and believes that the Investment Contract created a joint venture amongst herself, Tibbles and Tibbles Enterprises. Id. In or around November 2017, after sale of the Elder Street property was completed, but rather than returning to plaintiff the principal amount of her $30,000 investment

2

and the earned profits, Tibbles asked plaintiff whether she was interested in "rolling over" her investment into his next real property investment project. Id. at 4. As it appeared to plaintiff that Tibbles was able to generate a solid return on investment, she agreed. Plaintiff and Tibbles agreed that the investment terms would remain the same and that Tibbles would pay plaintiff $2,000 per month in profits from his real property investment projects for each month that Tibbles and/or Tibbles Enterprises continued to hold plaintiff's $30,000 principal investment. Id. At that time, plaintiff requested an additional written agreement to designate the specifications of the investment, but Tibbles never provided such additional written agreement. Id.

In or around May 2018, plaintiff learned that Tibbles had already flipped the property into which her investment had been "rolled over" and was working on a third property, specifically, real property commonly known as 7908 16th Street, Elverta, California (the "16th Street" property). Id. at 4. Tibbles was living on-site in a camper while the work was being completed. Id. As no information had been provided to plaintiff about the close of escrow on the Elder Street property, plaintiff became concerned and felt that she should at least receive payment of the profits due to her from the initial property investment. Id. Toward that end, plaintiff inquired of Tibbles as to the status of her investment with Tibbles and Tibbles Enterprises and requested a payout from Tibbles of the $6,000 in profit due to her from the sale of the Elder Street property. Id. In response to plaintiff's inquiry, Tibbles invited plaintiff to discuss the matter with him in his camper, offered her alcohol, and propositioned her for sex. Id. Plaintiff declined. Id.

In or around October 2018, Tibbles stated to plaintiff that all her money had been lost on the 16th Street property, however Tibbles had never informed plaintiff or otherwise consulted with her before he purportedly entered (or caused Tibbles Enterprises to enter into) the transaction(s) that he later claimed to have resulted in a complete loss of her investment. Id. at 5. To date, Tibbles has failed and refused to provide plaintiff with any documentation whatsoever regarding such transaction(s). Id. Plaintiff is informed and believes and based thereon alleges that Tibbles' representations to her regarding the status of her investment were false and that, in fact, Tibbles and Tibbles Enterprises have profited substantially through their use of her funds but they are nevertheless seeking to further enhance their profits by defrauding plaintiff. Id.

Plaintiff contends that subsequent research through publicly available documents reveals that Tibbles acquired the 16th Avenue Property for $351,000 in or around April 2018 and sold it for $540,000 in or around September 2018, generating an apparent gross profit of $189,000. Id. In or around October 2019, Tibbles admitted in writing that he was indebted to plaintiff but continued in his failure to provide plaintiff with any documentation showing how her money had been invested and whether any profits or losses resulted from Tibbles' and/or Tibble Enterprises' use of plaintiff's funds. Id. In or around April 2021, plaintiff became aware that Tibbles had formed and currently operates Tibbles Property Solutions as a vehicle for his real property investments. Id. Plaintiff is informed and believes and based thereon alleges that the assets of Tibbles Property Solutions were acquired using the proceeds and profits derived from plaintiff's initial $30,000 investment. Id.

    B. Background of Motions for Default Judgment

Summons were returned executed for each defendant on July 6, 2021. ECF Nos. 4-6. The Clerk entered defaults against all defendants on October 13, 2021, ECF No. 10, and plaintiff moved for default judgment on April 21, 2022, ECF No. 11. After the court took the motion under submission, ECF No. 11, Mark Tibbles appeared for the first time by filing a counter motion for default judgment in pro se, purportedly on behalf of himself and his business entities. ECF No. 13.

The undersigned held a hearing on June 15, 2022, during which it informed Mr. Tibbles that he could not bring a motion for default judgment against the plaintiff because the plaintiff had appeared, and that he could not represent his business entities as a pro se litigant. ECF No. 15. His motion for default judgment was construed as a motion to dismiss, and as such was denied. Id. The court ordered Mr. Tibbles to file an answer on his own behalf and to obtain an attorney for the LLCs, cautioning him that his failure to take these steps could result in entry of default judgment. Id. In light of Mr. Tibbles' appearance, the court set aside the entry of default as to him individually and—with the agreement of the parties—declared plaintiff's motion for default judgment (ECF No. 11) moot as to Mr. Tibbles as an individual only. Id. The motion remained open as to the entity defendants. Id.

4

Mr. Tibbles did not file an answer within the 60 days provided by the court. Nor did the business entity defendants appear through counsel and seek to set aside the defaults entered against them. Default was re-entered against Mr. Tibbles on August 28, 2022. ECF No. 19. Plaintiff then brought a new motion for default judgment against Mr. Tibbles. ECF No. 21.

## II.    Motion

Plaintiff moves for default judgment on all counts, seeking an award of $88,000.00 in compensatory damages plus prejudgment interest, and $592.00 to plaintiff for her costs. ECF No. 11-1 at 21; ECF No. 21.

## III.    Analysis

A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend against the action. See Fed. R. Civ. P. 55(a). However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." PepsiCo, Inc. v. Cal. Sec. Cans, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25 (9th Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments). Instead, the decision to grant or deny an application for default judgment lies within the district court's sound discretion. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). In making this determination, the court may consider the following factors:

> (1)    the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Default judgments are ordinarily disfavored. Id. at 1472.

Generally, once default is entered, well-pleaded factual allegations in the operative complaint are taken as true, except for those allegations relating to damages. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin.

5

Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847, 854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law") (citation and quotation marks omitted); Abney v. Alameida, 334 F.Supp.2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally insufficient claim.").  A party's default conclusively establishes that party's liability, although it does not establish the amount of damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure 37 that the default conclusively established the liability of the defaulting party).

    B. The Eitel Factors

        1. Factor One: Possibility of Prejudice to Plaintiff

The first Eitel factor considers whether the plaintiff would suffer prejudice if default judgment is not entered, and such potential prejudice to the plaintiff weighs in favor of granting a default judgment.  See PepsiCo, Inc., 238 F.Supp.2d at 1177.  Here, plaintiff would suffer prejudice if the court did not enter a default judgment because she would be without recourse for recovery.  Accordingly, the first Eitel factor favors the entry of default judgment.

        2. Factors Two and Three: Merits of Claims and Sufficiency of Complaint

The merits of plaintiff's substantive claims and the sufficiency of the complaint are considered here together because of the relatedness of the two inquiries.  The court must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought.  See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F.Supp.2d at 1175.  Here, the merits of the claims and sufficiency of the complaint favor entry of default judgment.

In this case premised on diversity jurisdiction (28 U.S.C. § 1332), plaintiff brings six causes of action: (1) promissory fraud; (2) accounting; (3) conversion; (4) breach of contract; (5)

breach of fiduciary duties; and (6) unfair business practices. ECF No. 1. They are addressed here in turn.

### i. Promissory Fraud

Plaintiff's first claim is for promissory fraud. In California, "'[p]romissory fraud' is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996) (internal citations omitted). "The elements of fraud that will give rise to a tort action are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Engalla v. Permanente Medical Group, Inc., 15 Cal.4th 951, 973-974 (1997).

Here, defendants promised to "roll over" plaintiff's investment into their next real property investment and continue to pay plaintiff $2,000 per month in profits along with a return of the entire principal amount of plaintiff's investment. Complaint ¶ 31. Plaintiff alleges this promise was made without the intent to perform, a fact evidenced by defendants' failure to deliver any payments to plaintiff after a single $6,000 payment in May 2018, as well as their refusal to provide plaintiff with any accounting as to their use of her funds. Complaint at ¶ 32. Plaintiff reasonably and justifiably relied on defendants' promises because she had successfully done business with Tibbles before, and had no reason to suspect that defendants would act to defraud her in subsequent transactions. Complaint at ¶ 33. As a result of the fraudulent acts of defendants, plaintiff has been damaged in the amount of $88,000. Complaint at ¶ 35. These allegations are sufficient to state a claim that supports the relief sought.

### ii. Accounting

Plaintiff has also asserted a claim for accounting, which has two elements: (1) "that a relationship exists between the plaintiff and defendant that requires an accounting" and (2) "that some balance is due the plaintiff that can only be ascertained by an accounting." Teselle v.

McLoughlin, 173 Cal.App.4th 156, 179 (2009).  Here, plaintiff alleges that defendants have refused and continue to refuse to provide an accounting of their disposition of plaintiff's investment despite repeated demands.  Defendants have not provided any financial records, corporate records, or any accounting records regarding the performance of plaintiff's investment.  Complaint ¶ 38.  Plaintiff is informed and believes and based thereon alleges that the accounts of defendants are so complicated that an ordinary legal action based on a fixed sum is impractical.  Complaint ¶ 39.  Therefore, plaintiff is entitled to an accounting of all funds she invested with defendants at the direct request of Tibbles.  Complaint ¶ 40.  These allegations, taken as true, afre sufficient to state a claim and support judgment.

### iii. Conversion

Conversion is a strict liability tort that neither rests in the knowledge nor the intent of the defendant.  Instead, the tort involves the breach of an absolute duty and the act of conversion itself is tortious.  Questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial.  Moore v. Regents of University of California, 51 Cal. 3d 120, 14, n.38 (1990).  Plaintiff satisfactorily alleges that defendants committed conversion by taking plaintiff's funds, without permission, for their own use, thereby exerting unapproved dominion and control over plaintiff's monies.  Complaint ¶ 42.  Plaintiff has repeatedly demanded that defendants return the funds that she invested with them, but they have continually refused to do so.  Complaint ¶ 43.  As a direct and proximate result of the conversion, plaintiff has been harmed and is now entitled to an award of damages in the amount $30,000.  Complaint ¶ 44.

### iv. Breach of Contract

Plaintiff has sufficiently alleged a claim for breach of contract.  In California, a breach of contract claim requires: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  Oasis West Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011).  Here, plaintiff and defendants executed the Investment Contract in or around July 31, 2017, which was later was modified by the parties in or around November of 2017.  Per the terms of the contract, plaintiff contributed $30,000 of her own funds as a "silent partner" for defendants to purchase, rehabilitate, and

8

thereafter sell real property. Plaintiff was to receive $2,000 per month in profits for each month that Defendants continued to hold Plaintiff's principal investment. Complaint ¶ 19.

Plaintiff performed all conditions, covenants, and promises to be performed under the Investment Contract. Complaint ¶ 46. However, beginning in October 2018 and continuing thereafter, defendants breached the Investment Contract by: (a) failing to pay to plaintiff the agreed-upon $2,000 per month share of profits arising from the real estate investments of defendants, (b) failing to repay to plaintiff her original $30,000 investment; and (c) failing to timely inform plaintiff as to the status of her invested monies. Complaint ¶ 47. By reason of the foregoing breaches by defendants, and as a direct proximate result of the failure and refusal of defendants to perform their obligations under the Investment Contract, plaintiff has been damaged in the amount of $88,000. Complaint ¶ 48.

v.   Breach of Fiduciary Duty

Plaintiff's allegations support defendants' liability for breach of fiduciary duty. The elements of a claim for breach of fiduciary duty are "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." Knox v. Dean, 205 Cal.App.4th 417, 432 (2012) (citations omitted). "Fiduciary duties are imposed by law in certain technical, legal relationships such as those between partners or joint venturers … trustees and beneficiaries, principals and agents, and attorneys and clients." GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., 83 Cal.App.4th 409, 416 (2000) (internal citations omitted) (disapproved on other grounds as stated in Reeves v. Hanlon, 33 Cal. 4th 1140 (2004)). A fiduciary duty under common law may arise "when one person enters into a confidential relationship with another." Id. at p. 417. It is a question of fact whether a party has entered a confidential relationship that gives rise to a fiduciary duty under common law. See Brown v. Wells Fargo Bank, N.A., 168 Cal.App.4th 938, 960–962 (2008); Hasso v. Hapke 227 Cal.App.4th 107, 140 (2014).

While there is no precise formula for determining whether a particular transaction is a bona fide joint venture, several factors have been identified as relevant when deciding that question, including: (1) whether there is an absolute obligation of repayment; (2) whether the

investor may suffer a risk of loss; (3) whether the investor has any right to participate in management; and (4) the identity of the seller. Junkin v. Golden West Foreclosure Service, Inc., 180 Cal.App.4th 1150, 1155-1156 (2010) "If the venture between the parties involves the acquisition of property from a third party, the courts tend to conclude that the arrangement between the parties was a risk capital venture and not a loan." Id. The presence or absence of any one factor is not conclusive when characterizing a transaction. Martin v. Ajax Construction Co., 124 Cal.App.2d 425, 433(1954).

Here, plaintiff successfully alleges that a bona fide joint venture was formed. Plaintiff and defendant Tibbles, individually and on behalf of the other named defendants, entered into a written agreement in which plaintiff invested a $30,000 capital contribution for the purpose of purchasing, rehabilitating, and selling real property for profit. Cumbie Decl., ¶ 7; Ex. A. The Investment Agreement stated that plaintiff was "a silent partner regarding the purchasing, rehab and selling of said property," which clearly indicates that both plaintiff and defendants believed the Investment Agreement to represent a joint venture. Id.

Moreover, the terms of the Investment Agreement did not guarantee the absolute right of repayment of the capital contribution, which is an important factor when determining whether the agreement was a loan or joint venture. Plaintiff was neither guaranteed any return on her initial contribution, and The Investment Agreement warned Plaintiff that "there is always a risk investing and consideration should be made before investing." Id. The lack of a guaranteed repayment and the language warning of loss strongly supports the formation of a joint venture.

The Investment Agreement terms, and the parties' conduct supports the creation of a joint venture, which establishes that defendants owed plaintiff the duty of loyalty and the duty of care. Complaint ¶ 51. Defendants breached the fiduciary duty of care and loyalty by failing to effectively manage the costs and expenses of their joint venture to ensure that the venture was profitable, as well as by electing to sell the 16th Street Property at a loss without notifying or consulting plaintiff prior to the transaction(s). Complaint ¶ 52. Defendants further breached the fiduciary duty of loyalty by diverting the proceeds and profits of the joint venture for their own use and by paying themselves to the exclusion of plaintiff. As a direct and proximate result of

these breaches, plaintiff alleges she suffered clear and calculable damages in the contract amount of $88,000. Complaint ¶¶ 53-54.

### vi. Unfair Business Practices Act

Finally, plaintiff has asserted a claim for unfair business practices, which arises from the California Unfair Practices Act. California Business and Professions Code § 17200 concerns unfair competition and prohibited activities and states that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL is a separate and distinct theory of liability. Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007). To state a claim for UCL, a plaintiff must identify an underlying statute that defendant violated. Ingels v. Westwood One Broad. Servs., Inc., 129 Cal.App.4th 1050, 1060 (2005) (no § 17200 liability "for committing 'unlawful business practices' without having violated another law"). A business practice is "unlawful," in violation of the California Unfair Competition Law (UCL), if it violates another state or federal law; the UCL "borrows" violations of other laws and treats them as independently actionable. Perea v. Walgreen Co., 939 F.Supp.2d 1026, 1040 (C.D. Cal. 2013).

Here, as discussed above, defendants have engaged in engaged in unfair business practices by (1) making false promises to plaintiff which induced her to enter into a joint venture agreement; (2) breaching the fiduciary duties owed to plaintiff by mismanaging or otherwise converting Plaintiff's funds; (3) and unjustly enriching themselves in the process. As a result of defendants' wrongful acts, plaintiff is entitled to restitution in the amount pleaded in her complaint. Complaint ¶¶ 57-59.

### 3. Factor Four: The Sum of Money at Stake in the Action

Under the fourth Eitel factor, the court considers the amount of money at stake in relation to the seriousness of defendant's conduct. Plaintiff seeks money damages in the amount of $88,000, which represents the amount owed under the Investment Contract. Plaintiff also seeks prejudgment interest and costs. The amount at stake is specifically tailored to the harm caused by defendants' breach. Accordingly, the court determines the amount at issue is proportionate to the seriousness of defendant's conduct and this factor favors entry of default judgment.

    4. Factor Five: Possibility of Dispute Concerning Material Facts

  The facts of this case are relatively straightforward, and plaintiff has provided the court with well-pleaded allegations supporting its claims and affidavits in support of its allegations. Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists.  See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F.Supp.2d at 1177.

    5. Factor Six: Whether Default Was Due to Excusable Neglect

  Upon review of the record before the court, there is no indication that the default was the result of excusable neglect.  See PepsiCo, Inc., 238 F.Supp.2d at 1177.  Here, defendants were duly served with a copy of the summons and complaint on June 29, 2021, and they acknowledged receipt by immediately reaching out to plaintiff's counsel to discuss a possible global settlement. Gentry Decl., ¶¶ 5-8.  After defendants refused to sign the settlement agreement, they assured plaintiff's counsel that they would retain an attorney to file an answer by October 8, 2021.  Gentry Decl., ¶¶ 9-10.  They failed to do so.  Gentry Decl., ¶ 11.  After not hearing from defendants and not seeing an answer on file, plaintiff, through her counsel, filed and served her requests for entry of default against defendants.  Gentry Decl., ¶ 14.

  This is not the usual default situation in which defendants, despite being aware of the lawsuit and knowing that requests for default had been filed against them, simply persisted in a complete failure to appear.  Mr. Tibbles did make a brief appearance on his own behalf, and temporarily seemed interested in preventing a default judgment.  However, after being personally instructed by the court in a video proceeding regarding the rules governing appearance, the process for setting aside entry of default, and the standards governing default judgment, Mr. Tibbles failed to take any further action.  Having been granted an extra 60 days to answer the complaint and to obtain counsel to appear on behalf of his businesses, see ECF No. 15, he chose

to forfeit that opportunity. Accordingly, Mr. Tibble's previous appearance weighs not against default judgment but in its favor; his failure to appear and defend following the June 15, 2022 hearing can be interpreted as nothing other than knowing and deliberate. This course of conduct is inconsistent with excusable neglect. This Eitel factor therefore favors the entry of a default judgment.

### 6. Factor Seven: Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible." Eitel, 782 F.2d at 1472. However, district courts have concluded with regularity that this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action. PepsiCo, Inc., 238 F.Supp.2d at 1177; see also Craigslist, Inc. v. Naturemarket, Inc., 694 F.Supp.2d 1039, 1061 (N.D. Cal. Mar. 5, 2010). Accordingly, although the court is cognizant of the policy favoring decisions on the merits – and consistent with existing policy would prefer that this case be resolved on the merits – that policy does not, by itself, preclude the entry of default judgment.

### 7. Conclusion: Propriety of Default Judgment

Upon consideration of all the Eitel factors, the court concludes that plaintiff is entitled to the entry of default judgment against defendants. What remains is the determination of the amount of damages to which plaintiff is entitled.

## C. Terms of Judgment

Plaintiff's motion seeks $88,000.00 for compensatory damages, plus prejudgment interest, plus attorney fees and costs in an amount to be determined upon subsequent motion. ECF No. 11-1 at 19. The compensatory damage request consists of the $30,000 of plaintiff's initial investment that was to be returned to her under the Investment Contract, plus 29 months of $2,000 payments that were to be made for each month that defendants continued to hold plaintiff's $30,000 principal investment. Plaintiff has submitted a declaration and supporting documents to support her compensatory damages request, including a copy of the written contract. ECF No. 11-2 at 5.

////

Plaintiff also requests prejudgment interest on the compensatory damages owed to her at the time her complaint was filed. "It is well settled that prejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism" and as such, state law applies in diversity actions. In re Exxon Valdez, 484 F.3d 1098, 1101 (9th Cir. 2007). California law "provides a 10 percent annual interest rate on obligations that do not specify a legal rate of interest." Phillips 66 Co. v. Petros Rai Stations, LLC, No. 2:15-cv-0368-TLN-KJN, 2016 WL 1654957, at *8 (E.D. Cal. Apr. 27, 2016), report and recommendation adopted, No. 2:15-cv-0368 TLN KJN, 2016 WL 10679252 (E.D. Cal. June 7, 2016); Cal. Code of Civ. Proc § 3289(b). Courts may award prejudgment interest on contract claims where damages are certain or are "capable of being made certain by calculation." Cal. Civ. Code § 3287(a).

Here, the contract damages are capable of being made certain by calculation, and the 10% prejudgment interest rate is warranted. Based on the $88,000 amount plaintiff seeks in damages, plaintiff is entitled to $24.11 per day in prejudgment interest from and after the date that plaintiff's complaint was filed. Because 547 days have passed between June 21, 2022, the date of this order, plaintiff is entitled to $13,188.17 in prejudgment interest. Gentry Decl., ¶ 15.

Pursuant to Federal Rule of Civil Procedure 54(d)(1), plaintiff requests that her allowable costs in the amount of $592.00 be added to the default judgment. Gentry Decl., ¶16. Finding plaintiff's damages request well supported, the court will recommend the award of $101,188.17 to plaintiff for her compensatory damages including prejudgment interest, and $592.00 to plaintiff for her costs.

### IV.    Conclusion

Based on the foregoing, it is RECOMMENDED THAT:

1. Plaintiff's motions for default judgment against each defendant, ECF Nos. 11 and 21, be granted;

2. The court enter judgment against the defendants and in favor of plaintiff in the amount of $101,188.17 for compensatory damages including prejudgment interest, and $592.00 for costs; and

3. That this case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: December 20, 2022

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE